Aida Inés Fernández Rivera y Arturo Palacios, peticionarios, *v.* Tribunal Superior de Puerto Rico, Sala de San Juan, Hon. J. M. Calderón, Hijo, Juez, demandado.

Número: C-64-42          Resuelto: 14 de junio de 1966

*Carlos D. Vázquez,* abogado de los peticionarios; *Ángel S. Pérez González,* abogado del interventor José González Benítez.

Sala Segunda integrada por su Presidente el Juez Asociado Señor Belaval y los Jueces Asociados Señores Hernández Matos, Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

El día *14 de junio de 1961,* doña Aida Inés Fernández Rivera, asistida de su esposo don Carmelo Millán Lugo, compareció ante el Notario don Ángel S. Pérez González y otorgó la escritura de hipoteca número 48 del protocolo de 1961 de dicho Notario, a favor del portador o tenedor por endoso de un pagaré por $16,000.00, a vencer el 14 de junio de 1964, con intereses desde su otorgamiento hasta su vencimiento o

pago total al tipo de ocho por ciento anual, con un crédito adicional de $1,600.00 para costas, gastos y honorarios de abogado en caso de reclamación judicial y otro crédito adicional para el pago de contribuciones, seguros o cualquier otro gasto que tuviera que atender el portador o tenedor por razón del incumplimiento del obligado. Para regir en caso de ejecución por cualquier procedimiento hipotecario, se valora la propiedad hipotecada en la cantidad de $16,000.00. Dicha hipoteca se inscribió *el día 30 de junio de 1961* al folio 125 vuelto del tomo 157 de Santurce Sur, finca número 20, inscripción 27ª del Registro de la Propiedad de San Juan, Puerto Rico, y con excepción de un aviso de demanda y embargo a favor de don Diego Portalatín Vélez, cuya vigencia o efectividad no forma parte de la cuestión litigiosa, la hipoteca a favor del pagaré al portador o tenedor arriba descrita, era el primer gravamen en tiempo inscrito sobre la finca hipotecada.

Según se alega en la solicitud de este recurso de *certiorari*, el *27 de diciembre de 1961*, el director del Negociado de Rentas Internas del Departamento de Hacienda de los Estados Unidos de América, valido de la autoridad que le confieren las Secs. 6321, 6322 y 6323 del Código de Rentas Internas Federal, radicó en la Secretaría de la Corte de Distrito de los Estados Unidos para Puerto Rico (Corte federal) un embargo contra la propiedad de la peticionaria Aida Inés Fernández.

Alegando ser el tenedor del pagaré hipotecario a que antes se ha hecho referencia y el incumplimiento de la cláusula de intereses, *el 1ro. de noviembre de 1962* don José González Benítez, demandante en la causa civil número 65–8076 de la Sala de San Juan Tribunal Superior de Puerto Rico, que le sirve de origen a este recurso, presenta en dicha Sala una acción para solicitar la ejecución, por la vía ordinaria de la hipoteca que garantizaba su pagaré. Por otro lado, el 24 de enero de 1963, el Gobierno de los Estados Unidos de

América por gestión del director de su Negociado de Rentas Internas, anuncia en el periódico EL MUNDO de la ciudad de San Juan, Puerto Rico, que procederá el 4 de febrero de 1963 a vender en pública subasta, en ejecución del gravamen por contribuciones federales (*federal tax lien*) que crea el embargo trabado de acuerdo con las Secs. 6321, 6322 y 6323 del Código de Rentas Internas de los Estados Unidos de América, la misma propiedad objeto del procedimiento de ejecución de hipoteca por la vía ordinaria seguido por el tenedor del pagaré hipotecario, don José González Benítez. Resultado: *el día 4 de febrero de 1963* se le adjudica dicha propiedad a uno de los peticionarios en este recurso de *certiorari*, don Arturo Palacios, según parece por la cantidad de $500.00 y *el día 24 de junio de 1963* se le adjudica la misma propiedad a la Talcott Inter-American Corp. por la cantidad de $22,000.00.

Según se alega, el día 11 de julio de 1963, la deudora hipotecaria doña Aida Inés Fernández Rivera, radicó en el procedimiento de ejecución por la vía ordinaria de la Sala de San Juan del Tribunal Superior de Puerto Rico, una moción para que se dejara sin efecto la sentencia, por los siguientes fundamentos: (a) Que el Tribunal ordenó el aumento del tipo mínimo de la subasta de diez y seis mil dólares a veintidós mil dólares, sin el consentimiento de la demandada y mediante sentencia dictada en un juicio seguido en su rebeldía, en el cual no estuvo ella presente; (b) la nulidad del mandamiento de ejecución por haberse incluido en el mismo por el Secretario cantidades a que no fuera condenada la deudora hipotecaria por la sentencia, tales como, 1—el crédito completo para contribuciones, seguros y otros gastos no adeudados, 2—el crédito completo de $1,600.00 para intereses de mora no adeudados y 3—intereses al ocho por ciento después de dictada la sentencia, no ordenados por el Tribunal e ilegales aunque hubieran sido ordenados. Por su parte, el rematista en la subasta federal

don Arturo Palacios radicó en el mismo procedimiento seguido ante la Sala de San Juan del Tribunal Superior de Puerto Rico, una moción solicitando la nulidad de la subasta porque no procedía la subasta de una propiedad que era suya y no de los deudores hipotecarios desde cuatro meses antes de celebrarse la misma, sin que a él se le hiciera parte en el procedimiento.

Lo primero que debemos resolver es el aparente conflicto de autoridad y distinta forma de disponer de la propiedad cuando se trata de un gravamen contributivo federal (*federal tax lien*) y de una hipoteca para garantizar una deuda o un crédito constituida de acuerdo con la Ley Hipotecaria de Puerto Rico e inscrita en el Registro de la Propiedad nuestro. La Sec. 6321 del Código de Rentas Internas de los Estados Unidos—26 U.S.C.A. Sec. 6321, pág. 437 (1955) y Supl. Acumulativo del 1965, pág. 158—dispone: "Si cualquier persona sujeta a pagar cualquier impuesto no lo hace o se niega a pagar el mismo después de ser requerida, la cantidad (incluyendo cualquier interés, cantidad adicional, impuesto adicional o penalidad civil imponible, junto con cualesquiera costas que puedan devengarse adicionalmente) constituirá un gravamen a favor de los Estados Unidos sobre toda propiedad o derecho de propiedad, real o personal que pertenezca a dicha persona." La Sec. 6322 del mismo estatuto dispone: "A menos que otra fecha de vigencia sea específicamente designada por la Ley, el gravamen impuesto por la Sección 6321 surgirá en el momento en que la tasación sea hecha y continuará hasta que la obligación por la cantidad así tasada sea satisfecha o no pueda hacerse cumplir por razón del tiempo transcurrido." La Sec. 6323, a su vez, establece: (A) "Excepto lo que de otra manera se dispusiere en el inciso (c), el gravamen impuesto por la Sección 6321 no será válido contra ningún acreedor hipotecario, tenedor de prenda, comprador o acreedor por sentencia hasta tanto el Secretario o un delegado suyo, registre la notificación de la imposición de dicho grava-

men: (1) En la dependencia del estado o territorio en el cual la propiedad sujeta al gravamen esté situada, cuando el estado o territorio haya dispuesto por ley tal dependencia para el registro de tal notificación. [Como sabemos, en Puerto Rico, desde el 13 de junio de 1964 en adelante, las notificaciones de contribuciones federales adeudadas, se inscribirán en la Sección del Registro de la Propiedad donde radiquen los bienes inmuebles afectados. Ley Núm. 54 de 13 de junio de 1964.] (2) En la oficina del Secretario de la Corte de Distrito de los Estados Unidos para el distrito judicial dentro del cual la propiedad sujeta al gravamen esté situada, cuando el estado o territorio no haya dispuesto por ley una dependencia dentro del estado o territorio para el registro de tal notificación . . . (b) Si la notificación registrada de acuerdo al inciso (a) (1) está redactada en la forma que sería válida si fuera registrada con el Secretario de la Corte de Distrito de los Estados Unidos de acuerdo con el inciso (a) (2), tal notificación será válida aunque sea contraria a cualquier ley del estado o territorio que prescriba la forma o contenido de la notificación de un gravamen . . . ."

A primera vista, la disposición incluida en la Sec. 6323, en el sentido, que "el gravamen impuesto por la sección 6321 no será válido contra ningún acreedor hipotecario, tenedor de prenda, comprador o acreedor por sentencia hasta tanto el Secretario o un delegado suyo registre la notificación de la imposición de dicho gravamen", da la impresión que basta con el registro de dicha notificación para que cualquier prioridad en los gravámenes establecidos de acuerdo con las leyes estatales ceda ante el gravamen contributivo federal.

■ Nunca fue la intención del Congreso establecer una prioridad en el gravamen federal ante la cual quedaran sin efecto todas las anteriores garantías del negocio jurídico estatal. La regla que impuso el lenguaje de la Sec. 6321 fue determinar la prioridad del gravamen federal o el gravamen estatal tomando como criterio cuál de los dos gravámenes se

había perfeccionado antes *(choate lien rule)*. Como se ha visto el gravamen contributivo federal se perfeccionaba por la simple notificación del registro de la imposición de dicho gravamen en la dependencia provista por el estado o territorio para registrar dichos gravámenes o en la Secretaría de la Corte de Distrito de los Estados Unidos si no existía tal dependencia. En cuanto a la fecha en que se perfeccionaba al gravamen creado por la legislación estatal, cada caso se regía por las disposiciones del estatuto correspondiente. Existe una variedad de circunstancias en las cuales no es fácil determinar la prioridad de uno u otro gravamen, pues aunque se trata de registros anteriores de acuerdo con la ley local, el nacimiento del derecho garantizado es posterior al registro del gravamen federal. De ahí se origina esta copiosa y no siempre bien ordenada jurisprudencia sobre el *"choate lien"* y el *"inchoate lien"*, referente a las cartas de crédito con garantía continua hipotecaria *(open end mortgage)*, a las hipotecas o garantías prendatarias sobre bienes muebles para responder del pago en el futuro de adelantos de dinero o de las obligaciones a plazos, cuyo pago futuro resulta posterior a la notificación de registro del gravamen contributivo federal *(inchoate lien)*.

Pero buscando la mayor reciprocidad de intereses, en una situación que podía ser onerosa para las economías estatales o territoriales, la jurisprudencia, tanto de la Corte Suprema de los Estados Unidos como de las Cortes de Circuito y cortes supremas de los distintos estados, empezaron a desarrollar los tres principios de excepción sobre los cuales se sostendría la prioridad de los gravámenes estatales: (1) Cuando los acreedores favorecidos por los gravámenes y otros reclamantes pudieran demostrar que la propiedad, objeto de la imposición federal, no era propiedad del contribuyente; (2) en caso de reclamarse un gravamen anterior en tiempo, específico, perfeccionado, con derecho a preferencia bajo la regla de Derecho común que: "el primero en tiempo es pri-

mero en derecho" y (3) mientras no se hubiera registrado un gravamen federal, los acreedores y otros reclamantes procuraran que se les considerara comprendidos dentro de las cuatro clases de acreedores—acreedor hipotecario, tenedor de la prenda, comprador o acreedor por sentencia—específicamente protegida por el propio estatuto.

En el caso de *United States* v. *New Britain*, 347 U.S. 81, 98 L.Ed. 520 (Minton) (1954), cita precisa a las págs. 85–86 U.S.; 525–526 L.Ed., el ilustrado Juez ponente, hablando a nombre de un tribunal unánime, se expresó así: "Entendemos que la prioridad de estos gravámenes establecidos por estatuto se determina por otro principio de ley, a saber: 'el primero en tiempo es primero en derecho'." Según lo expresado por el Juez Presidente Marshall en *Rankin* v. *Scott* [U.S.]: 'Se cree que este principio debe ser universal, que un gravamen anterior debe tener prioridad en cualquier reclamación, y debe ser satisfecho ante todo con la propiedad obligada a ello, a menos que el gravamen sea intrínsecamente defectuoso o pueda ser desplazado por alguna actuación de la parte que lo disfruta, que posponga su derecho en una Corte de ley o de equidad ante reclamante subsiguiente.' Este principio es ampliamente aceptado y así se aplica, en defecto de una norma legislativa en contrario [citas]. Pensamos que el Congreso tuvo este principio cardinal en mente al enactar la sección 3670 [anterior numeración] y que ningún plan de prioridad ha sido impuesto en dicha sección. Entonces, la prioridad de cada gravamen establecido por estatuto, que pueda estar aquí en controversia, dependerá de la fecha en que fuere impuesto sobre la prioridad en cuestión y llegara a perfeccionarse." Véanse además: Anotación sobre *Prioridad de los Gravámenes Contributivos Federales*, 2 L.Ed.2d 1823 (1958), cita precisa a la pág. 1826; *Southern Railway Company* v. *United States*, 306 F.2d 119 (Brown) (1962), cita precisa a las págs. 125–127; Segunda Anotación sobre *Prioridad de los Gravámenes Contributivos Federales*, 7

L.Ed.2d 904 (1962), cita precisa a la pág. 906; Anotación sobre la *Prioridad entre el Gravamen Contributivo Federal y la Hipoteca*, 90 A.L.R.2d 1179 (1963), cita precisa a las págs. 1180–1181; *Corigliano* v. *Catla Construction Co.*, 231 F.Supp. 245 (Van Pelt Bryan) (1964), cita precisa a las págs. 248–250; *United States* v. *Lebanon Woolen Mills Corporation*, 241 F.Supp. 393 (Connor) (1964), cita precisa a las págs. 395–401; Anotación sobre *Gravámenes Contributivos Federales*, 94 A.L.R.2d 748 (1964), cita precisa a las págs. 750–751; *Exchange Bank & Trust Co.* v. *Tubb Manufacturing Co.*, 246 F.2d 141 (Hutchinson) (1957), cita precisa a las págs. 143–144.

■ Siendo esto así es indudable la prioridad de que goza en Puerto Rico una hipoteca de fecha anterior, debidamente registrada en nuestro Registro de la Propiedad, sobre cualquier gravamen contributivo federal de fecha posterior.

El segundo aspecto de la cuestión, es el que se refiere a la nulidad de la subasta por haberse incluido cantidades que si estaban autorizadas por el documento de hipoteca no se adeudaban al momento del remate. De acuerdo con la hipoteca, la propiedad hipotecada respondía de $16,000.00 de principal, de un crédito separado para intereses hasta la cantidad de $1,600.00, de un crédito adicional para honorarios de abogado y costas del procedimiento hasta la cantidad de $1,600.00 y de otro crédito adicional para contribuciones, seguros o cualquier otro gasto relacionado con la propiedad hipotecada, o sea una responsabilidad hipotecaria de $20,-800.00, y de una exención de hogar seguro hasta la cantidad de $1,500.00. Sin embargo, la propiedad que respondía de toda esa carga hipotecaria y de dicha exención de ejecución, estaba tasada para los fines de la primera subasta, en $16,000.00 solamente.

■ En sus conclusiones de hecho, el ilustrado Juez J. M. Calderón, hijo, liquidó el crédito, en aquella parte que resultaba liquidable antes de la subasta, en la siguiente forma:

"Los demandados no han pagado el principal ni los intereses hasta la fecha; las mensualidades vencidas y no pagadas son seis mensualidades consecutivas no pagadas hasta la radicación de la demanda y que montan a la suma de seiscientos treinta y nueve dólares con noventa y seis centavos ($639.96). Los demandados tampoco han pagado los intereses devengados desde la radicación de la demanda en noviembre primero de mil novecientos sesenta y dos, hasta el corriente mes de marzo de mil novecientos sesenta y tres, que montan a la suma de quinientos treinta y tres dólares con treinta centavos ($533.30). Los demandados adeudan a la parte demandante las siguientes sumas sobre cantidades vencidas, líquidas y exigibles: (a) dieciseis mil dólares ($16,000.00) por concepto de principal; (b) seiscientos treinta y nueve dólares con noventa y seis centavos ($639.96) correspondientes a seis mensualidades de intereses vencidas y no pagadas con anterioridad a la radicación de la demanda; (c) quinientos treinta y tres dólares con treinta centavos ($533.30) de intereses no pagados desde la radicación de la demanda hasta el corriente mes de marzo de mil novecientos sesenta y tres que totalizan la suma líquida y exigible de diecisiete mil ciento setenta y tres dólares con veintiseis centavos ($17,173.26)." Por nuestra parte podemos añadir dos partidas que son líquidas *per se*: $1,600.00 del crédito adicional para costas, gastos y honorarios de abogado, $1,500.00 de la exención de hogar seguro en caso de venta forzosa declarada por la Ley Núm. 1 de 11 de febrero de 1955—31 L.P.R.A. sec. 1851 Supl. Acum. 1965, págs. 112–113. Sumadas las tres cantidades arrojan un total de $20,273.26. En cuanto al otro crédito adicional por $1,600.00 para el pago de contribuciones, seguros y cualquier otro gasto en que incurriere el tenedor o acreedor hipotecario por culpa de los deudores hipotecarios, firmada por el Sr. Colector de Rentas de San Juan, existe en los autos una certificación de deuda por contribuciones de recibos ya en cobro de $891.72 y de un recibo pendiente de $396.24, lo

cual asciende a $1,287.96. Sumado este crédito por contribuciones territoriales a la anterior cantidad de $20,273.26 da una suma total de créditos hipotecarios por contrato e hipotecas legales contra la propiedad de $21,561.22. No estuvo desacertado el ilustrado Juez Sr. J. M. Calderón, hijo, en fijar el tipo de la subasta, no por la cantidad pactada de $16,-000.00 sino por una cantidad suficiente a cubrir la deuda hipotecaria en su totalidad, de $22,000.00. No deja de ser curioso que a la persona que más le conviene la liquidación larga en este caso, la deudora hipotecaria, sea la persona que impugna la misma.

La peticionaria, señora Aida Inés Fernández Rivera se queja del aumento del tipo sin autorización de ella. Pero se olvida que después de emplazada se desentendió del litigio y su abogado retiró la representación profesional que le había sido dada. Quedaba, entonces, la cuestión en manos del ejecutante y del Tribunal. Aumentar el tipo de subasta queda sujeto al arbitrio de los interesados, sobre todo, en una ejecución de hipoteca por la vía ordinaria. Oigamos a Roca Sastre: "El precio que como tipo de subasta se señale, debería consistir en la parte restante que resultare del valor real de la finca después de descontado el importe de las cargas y gravámenes que han de subsistir. En la práctica, muchas veces se olvida esta regla. Claro que el no hacerlo así tiene cierta ventaja en el supuesto de que al llegar la ejecución ya esté cancelada una hipoteca anterior; pero las partes pueden establecer tipos distintos para la subasta, combinados con el evento de la desaparición de cargas preferentes. ¿Pueden de mutuo acuerdo los interesados modificar posteriormente el tipo señalado? Esto puede ser conveniente cuando han sobrevenido circunstancias tales que hayan convertido en ficticio el precio asignado al constituir la hipoteca. Parece que no hay dificultad en permitirlo, ya que esta modificación no supone alteración ninguna de los trámites de este procedimiento— cosa que prohibe el art. 129 de la ley—pues ésta es materia

que se deja a la voluntad de las partes": IV Roca Sastre—*Derecho Hipotecario*, pág. 830 (5ta. ed. Bosch 1954). Todavía más aplicación tendría la norma permisiva en Puerto Rico, ya que en nuestra patria el trámite de ejecución no se rige por la Ley Hipotecaria sino por las disposiciones del Enjuiciamiento Civil referente a la manera de satisfacer las sentencias.

■ *Resuelta así la legalidad de la ejecución de hipoteca por la vía ordinaria, entendemos que en este caso sólo deben subsistir la reclamación del interventor Arturo Palacios, en caso de existir algún excedente del precio de remate, hasta el montante de lo que él haya pagado por el remate de la finca en la Secretaría de la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, y la reclamación de la peticionaria sobre el hogar seguro sobre la cual respondería siempre la propiedad ejecutada. El resto de las reclamaciones deben declararse sin lugar y confirmarse la sentencia del 18 de marzo de 1963 y la resolución de 1ro. de mayo de 1964.*